Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4    RAMSEY TOSSA, RAKIA TOSSA,
 5    SILVIA TOSSA and RHONDA TOSSA,
 6              Plaintiffs,
 7    -vs-                      No:  14-12319
 8                              HON. GERALD E. ROSEN
 9                              MAG. MICHAEL HLUCHANIUK
10    Federal Task Force Officer (T.F.O.)
11    ADAM TARDIF, U.S. Drug Enforcement
12    Agency (D.E.A.); Group Supervisor
13    KENT KLEINSCHMIDT, D.E.A.; Federal
14    T.F.O. POWELL, D.E.A.; Special Agent
15    (S.A.) CHERYL BENEDICT, D.E.A.; S.A.
16    HOLTON, D.E.A.; S.A. FITCH, D.E.A.;
17    S.A. MOORE, D.E.A.; S.A. WEST, D.E.A.;
18    S.A. HOPKINS, D.E.A.; Officer KENNETH
19    BRESINSKI, S.H.P.D.; Officer TOM STECHLY,
20    S.H.P.D.; Michigan State Police Trooper
21    M.T. UNTERBRINK; all in their individual
22    and/or official capacities,
23              Defendants.
24    _____/
25    Pages 1 - 66.
```



Jeremy Fitch
6/16/2016

Page 6

TABLE OF CONTENTS

| WITNESS | PAGE |
|---|---|
| JEREMY FITCH | |
| Examination by Mr. Goodman | 7 |
| Examination by Mr. Fedynsky | 65 |

EXHIBITS

| NUMBER | PAGE |
|---|---|
| Deposition Exhibit No. 1 (Notice of Taking Deposition) | 17 |
| Deposition Exhibit No. 2 (Manchester Report of Investigation) | 45 |
| Deposition Exhibit No. 3 (Operational Plan) | 42 |
| Deposition Exhibit No. 4 (Photograph) | 18 |
| Deposition Exhibit No. 5 (Marc Drive Report of Investigation) | 23 |
| Deposition Exhibit No. 6 (Handwritten Notes) | 35 |

Page 7

          Detroit, Michigan
          Thursday, June 16, 2016
          1:06 p.m.
             - - -
          JEREMY FITCH
was thereupon called as a witness herein, after
having been first duly sworn to tell the truth,
the whole truth, and nothing but the truth, was
examined and testified as follows:
       MR. GOODMAN: All right. The record
will show this is the deposition of Agent Jeremy
Fitch taken pursuant to Notice under the Federal
Rules of Civil Procedure for any and all
purposes therein provided.
          EXAMINATION
BY MR. GOODMAN:
Q. Is it okay if I call you Agent Fitch? Will that
   work?
A. That's fine.
Q. State your full name, Agent Fitch, please?
A. Jeremy Carter Fitch, F-i-t-c-h.
Q. How old are you?
A. I am 40.
Q. How tall are you?
A. Six two.

Page 8

Q. How much do you weigh?
A. About 190.
Q. You're a special agent with the drug enforcement
   agency?
A. Administration, yes.
Q. Administration, yes.
A. Yes, sir.
Q. How long have you been an agent with the DEA?
A. I've been an agent since August of 2010, so
   going on six years. I started the academy in
   March, but became an agent in August.
Q. Do you have a law enforcement background prior
   to that?
A. I do not.
Q. What did you do prior to that?
A. I worked for a health care consulting firm. We
   did mergers, acquisitions, strategic planning,
   operations improvement for hospitals and medical
   centers, university medical centers.
Q. Educational background?
A. I have a Bachelor's of Science from Michigan
   State University. I have a Master's from
   University of Minnesota.
Q. Master's in?
A. Healthcare Administration.

Page 9

Q. Okay. Have you ever been deposed before?
A. I have not.
Q. I'm going to basically give you the basic ground
   rules and see if we can understand one another.
A. Yes, sir.
Q. I'm here to ask you some questions and I expect
   you to answer those questions. If you don't
   understand or can't hear anything or you need to
   have it repeated, please tell me and I will
   clarify it, rephrase it or repeat it for you.
   Do you understand?
A. Yes, sir.
Q. And the court reporter is writing down
   everything we say, so that if you just need the
   question read back, she can read it back for us
   as well. You understand that, right?
A. I do, yes.
Q. And as you are now doing, please answer the
   questions verbally because sometimes people will
   nod, shake their head, say uh-huh or uh-uh and
   that makes for an unclear or uncertain record,
   so if you do that, I'll try to remind you to
   answer verbally. Do you understand?
A. I understand, sir.
Q. And if I do do that, I'm not being rude. I'm

Jeremy Fitch
6/16/2016

## Page 10

1  just trying to get a good record, okay?
2  A. Understood.
3  Q. If your attorney or any of the attorneys object
4     to any of my questions, please withhold your
5     answer until the objection is stated on the
6     record and then most likely you'll be expected
7     to answer the question, okay?
8  A. Yes, sir.
9  Q. And again, if you don't remember it at that
10    point or you're distracted because of the
11    objection, it can be repeated or read back, all
12    right?
13 A. Yes, sir.
14 Q. With that in mind, let's proceed. I sort of
15    want to, if I may, skip ahead a little bit in
16    the story and ask you about your encounter with
17    Mr. Ramsey Tossa on July 26th, 2011. Do you
18    recall that event?
19 A. I do.
20 Q. All right. And that was you were executing a
21    search warrant, is that right, sir, part of a
22    team that was executing a search warrant?
23 A. Yes, sir.
24 Q. And what was your assignment for that particular
25    operation, if you can recall?

## Page 11

1  A. I was assigned to the entry team.
2  Q. And did you, in fact, enter the house immediately?
3  A. I did not.
4  Q. What was -- why not? What were you doing?
5  A. I was observing and staying with Mr. Tossa.
6  Q. How is it that you were observing and staying
7     with Mr. Tossa rather than entering the house?
8     Who instructed you to do that?
9  A. It's just routine operations during a search
10    warrant. I was in the rear of the stack, so
11    naturally as people came from the house, they
12    would be -- they're handed off to the rear to
13    clear an entryway into the house.
14 Q. And the people in the rear of the stack are
15    expected to keep an eye on the people who are
16    handed off to them. Is that what you're saying?
17 A. Typically.
18 Q. And that was the role that you were playing on
19    this particular night?
20 A. Yes, sir. Right. I didn't go into the search
21    warrant expecting to do that, but I'm always
22    prepared to do that if that's the case.
23 Q. And explain the circumstances -- did you
24    actually observe the knock and announce at the
25    house door?

## Page 12

1  A. Yes, sir.
2  Q. Who announced?
3  A. David Powell.
4  Q. Who knocked?
5  A. I don't actually -- I don't recall. I remember
6     David Powell announcing.
7  Q. And how was the door opened, if you can recall?
8  A. I don't recall. I do know that it wasn't breached.
9  Q. When you say breached, do you mean like rammed
10    open or forced open?
11 A. Or forced open.
12 Q. Right. Do you know who opened it?
13 A. I do not.
14 Q. Did you see the door opened?
15 A. I did see -- I didn't see the -- I don't recall
16    seeing the door open, but I recall seeing it
17    open when individuals such as Mr. Tossa came out
18    of the door.
19 Q. Did you see Mr. Tossa come out of the door?
20 A. Yes, I did.
21 Q. What happened when he came out of the door?
22 A. He was escorted by Agent Holton to the porch and
23    off the porch and handed to me.
24 Q. Let's go back for just a moment. When you say
25    he was escorted by Agent Holton, can you

## Page 13

1  describe the manner in which he was escorted?
2  A. Sure. He was taken by the arm and guided. It
3     was more of a guiding than -- I guess that's
4     probably the best description. He was guided
5     off the porch. It wasn't that large of a step,
6     so he was guided as he was taking steps down the
7     porch for Mr. Tossa's safety.
8  Q. Guided to prevent him from tripping or falling?
9  A. Yes, sir.
10 Q. How did he appear at that time?
11 A. Rapid breathing, but I didn't notice anything
12    out of the ordinary. I mean he was an older
13    gentleman.
14 Q. You observed rapid breathing, however, is that
15    right?
16 A. I heard rapid breathing.
17 Q. Did you consider the possibility that he was
18    having shortness of breath or difficulty breathing?
19 A. Rapid breathing isn't unusual in our line of work.
20 Q. It's not unusual?
21 A. No, not at all. I mean it's a stressful
22    situation for everybody.
23 Q. Right.
24 A. So I mean even myself, I have to work on slowing
25    my breathing down, so it's not unusual. I



Hanson Renaissance
Court Reporters & Video
hansonreporting.com
313-567-8100

Jeremy Fitch
6/16/2016

Page 14

1   wasn't surprised by seeing that.
2   Q.  And when you say you have to slow your breathing
3       down, why would you be breathing rapidly under
4       these circumstances?
5   A.  I don't know who's in there, if someone's armed.
6       We do high -- I mean the search warrants,
7       naturally drug trafficking is dangerous, just
8       the nature, the very nature of doing search
9       warrants. I've heard numerous stories of people
10      getting shot, attacked, assaulted, so I was only
11      on for a year or so. I was even more amped up
12      than I am now so to speak.
13  Q.  Less than a year actually, right?
14  A.  I was on for less than a year. I'm sorry.
15  Q.  And so you were operating under a certain level
16      of stress yourself given the circumstances of
17      the operation, right?
18  A.  Yes, sir.
19  Q.  Did you see Mr. Tossa step out of the doorway or
20      did you just observe him once he was on the
21      porch for the first time?
22  A.  Once he was on the porch.
23  Q.  All right. So do you know how he was touched,
24      grabbed or held as he exited the doorway itself?
25  A.  I do not.

Page 15

1   Q.  Was anyone other than Agent Holton holding onto
2       Mr. Tossa or near him at the time he was
3       escorted down to you?
4   A.  As he was nearing the, I guess the portion of
5       the porch where I could see, it appeared only
6       that Agent Holton was escorting him.
7   Q.  And you said you heard rapid breathing, but
8       other than rapid breathing, did you hear
9       anything that indicated that Mr. Tossa was
10      having any difficulty breathing?
11  A.  No, sir.
12  Q.  How was he dressed?
13  A.  I don't recall. He was dressed. I know that.
14      I don't recall how he was dressed.
15  Q.  Did he have pants on?
16  A.  I don't recall if they were pants or shorts or
17      what. I mean I don't recall.
18  Q.  By the time he was handed to you, would it have
19      been routine for him to have been searched for
20      weapons or dangerous instruments of any sort?
21  A.  Not always. I see that as my responsibility.
22      Even if he was searched and handed off, I would
23      conduct another search.
24  Q.  We'll get to that in a minute, but you say it
25      would not have been routine for let's say Agent

Page 16

1       Holton to have searched him as well?
2           MS. URBANIC: Objection as to form, but
3       certainly answer if you understood the question.
4   Q.  (Continuing, by Mr. Goodman) Go ahead.
5   A.  It depends on the circumstances I should say.
6       Generally it's been my experience that they're
7       not routinely searched. If something is
8       observed, then they would be searched or, you
9       know, if a gun was observed, it would be taken
10      immediately, but it's not -- it's not -- I don't
11      typically observe people searching them as
12      they're handing them back.
13  Q.  You viewed this as your role to do the
14      searching, is that right, sir?
15  A.  Yes, sir.
16  Q.  And did you search him?
17  A.  Briefly.
18  Q.  How did you do that?
19  A.  Just a quick pat on the waist initially.
20  Q.  And when he was handed to you, did you touch him
21      or hold onto him in any fashion at all?
22  A.  Yes, when he was handed to me I continued to
23      guide him to where I ultimately placed him just
24      a couple of steps off the porch.
25  Q.  You placed him on the grass, is that right, sir?

Page 17

1   A.  Yes, sir, he was compliant, so I just assisted
2       him in getting down to the grass.
3   Q.  When you say down to the grass, what do you mean?
4   A.  I had him initially proned out on his chest.
5   Q.  Okay. Let me go through a couple of these
6       exhibits first, if I may.
7   A.  Sure.
8   Q.  What is before you here is what is marked Moore
9       and Fitch Exhibit 1. Have you seen that
10      document before?
11  A.  Yes, sir.
12  Q.  And it asks you to bring with you certain
13      documents, does it not?
14  A.  Oh, I'm sorry. This document you're referring to?
15  Q.  Yes, that's right.
16  A.  Yes, sir.
17  Q.  And did you bring those with you?
18          MS. URBANIC: Objection. I just want
19      to incorporate by reference the objections that
20      have already been placed in response to Agent
21      Fitch's Responses to Plaintiffs' Requests for
22      Production and incorporate all those objections
23      here.
24  Q.  (Continuing, by Mr. Goodman) Over objection, did
25      you bring those with you?

Jeremy Fitch
6/16/2016

Page 18

1  A. They are in Miss Urbanic's room.
2  Q. So your attorney has the documents, is that
3     right? Is that what you're saying?
4  A. I set them on the desk in her office.
5  Q. All right. By the way, do you have any personal
6     notes of this incident at all, handwritten notes?
7  A. I do not. No, I do not, sir.
8  Q. Or typewritten notes of any sort?
9  A. I do not, sir.
10    MS. URBANIC: I would just again
11    reiterate the objection. This is duplicative of
12    the previous Request for Production of Documents.
13 Q. (Continuing, by Mr. Goodman) All right. Let's
14    get back to where we were, which was you placing
15    Mr. Tossa on the ground.
16    MR. GOODMAN: Off the record.
17    (Off the record discussion.)
18 Q. (Continuing, by Mr. Goodman) I'm going to hand
19    you what has previously been marked as Moore and
20    Fitch Exhibit 4 and ask you if you can identify
21    this as the area in front of the Tossa residence?
22 A. I'm having trouble seeing it. I mean it was a
23    smaller yard. It looks similar.
24 Q. It looks similar anyway, is that right?
25 A. Yes, sir.

Page 19

1  Q. Can you see the porch area? I know it's hard.
2     I apologize for the difficulty.
3  A. I can't.
4  Q. So let's for the moment just try and describe it
5     physically. You say you escorted him out a
6     couple steps away from the front porch, is that
7     right, sir?
8  A. Right. It was probably a few. It was enough
9     distance so that it would allow the team, you
10    know, access to get in the house, so it was away
11    from the porch. I don't remember exactly how
12    far, but it was --
13 Q. Were you also -- I'm sorry.
14 A. I don't remember exactly how far, but it wasn't --
15    it was within, you know, five, ten feet.
16 Q. Were you off to the side in any particular way,
17    off to the right or left of the porch?
18 A. I don't recall exactly. I mean I know it was in
19    the front yard off the porch.
20 Q. So to say, if I were to say it was between five
21    and ten feet, would that sound about right to
22    you from the front porch?
23 A. Yes, approximately.
24 Q. All right. And it was on the lawn, right?
25 A. Yes, sir.

Page 20

1  Q. So you took him out to the lawn and then what
2     did you do in terms -- I think you said
3     something about placing him prone on the ground,
4     is that right?
5  A. I assisted him in getting to the -- having him,
6     getting him into a position where he was proned
7     onto the grass.
8  Q. How did he know he was supposed to get prone
9     onto the grass?
10 A. I was giving him verbal commands.
11 Q. What is -- I'm sorry.
12 A. And he was compliant with those. So I went
13    immediately to an assistance mode. I mean he
14    was an older gentleman, so I was assisting him.
15 Q. What did you tell him?
16 A. "I'm going to place you on the ground."
17 Q. And why did you decide to place him on the ground?
18 A. Because when I was handed him, I didn't know
19    what he had on him. Just for the safety of
20    himself and other officers I initially did that.
21 Q. Now, you've described earlier how you had
22    searched him. Do you recall that? Around his
23    waist and so on?
24 A. Yes. Typically I don't recall exactly when I
25    did the search on this, but typically I would

Page 21

1     place them onto the ground and then do a quick
2     pat along the waistline.
3  Q. Is that the way in which you searched him on
4     this occasion?
5  A. I don't recall.
6  Q. You may well have searched him while he was
7     standing up, is that right?
8  A. Yes, I may have patted him around the waist. I
9     don't recall though.
10 Q. Is it routine for you to place persons who you
11    are detaining or holding on the ground in the
12    way in which he was placed on the ground?
13 A. For somebody that's compliant, yes. I probably
14    assisted him more, just given his age.
15 Q. But for them to get on the ground, is that routine?
16 A. Absolutely.
17 Q. And why is that?
18 A. For safety purposes until we can complete a full
19    check of the individual.
20 Q. A search?
21 A. Full search.
22 Q. What about handcuffing?
23 A. It's typical that we handcuff.
24 Q. When they're on the ground, once they're on the
25    ground?

6 (Pages 18 to 21)


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313-567-8100

Jeremy Fitch
6/16/2016

Page 22

1  A. Before.
2  Q. So you would have handcuffed him typically or
3     routinely while he was still standing, is that
4     right?
5  A. I should say if they're compliant I would
6     handcuff while they're still standing typically.
7  Q. And he was compliant, is that right?
8  A. He was compliant.
9  Q. What was the reason that you did not handcuff
10    him while he was still standing?
11 A. He was compliant and elderly, or I should say
12    older. I just deemed -- in retrospect I
13    probably should have, but I just didn't. In
14    this case he just, he was an older gentleman and
15    he was fully compliant and I just decided not to.
16 Q. Wasn't the reason that you did not handcuff him
17    initially was because he was having difficulty
18    breathing?
19 A. No, sir.
20 Q. I'm going to hand you what has previously been
21    marked Moore and Fitch Deposition Exhibit 5.
22    Strike that. I'm going to show you what has
23    been marked Moore and Fitch Deposition Exhibit 6
24    and ask you if you've seen this document before?
25    MR. GOODMAN: Off the record.

Page 23

1     (Off the record discussion.)
2     MR. GOODMAN: Let's go back on the
3     record. I want to correct the record. What
4     I've handed the witness is report of
5     investigation of the execution of the warrant on
6     Marc Street in Sterling Heights on July 26th,
7     2011 and that is Moore and Fitch Exhibit No. 5.
8     MR. KASZUBSKI: Bill, could you send
9     one down here? We're missing one I think.
10 Q. (Continuing, by Mr. Goodman) Can you identify
11    this exhibit, sir?
12 A. Yes, sir. It's the DEA-6 report of
13    investigation for the search warrant at Marc Drive.
14 Q. And who wrote this, if you know?
15 A. It's authored by Adam Tardif.
16 Q. And was this -- did he write this after he had
17    spoken with you and others concerning the events
18    of the operation?
19    MS. URBANIC: Objection as to
20    foundation, but answer if you know.
21 Q. (Continuing, by Mr. Goodman) Go ahead.
22 A. He wrote this after the search warrant. I'm not
23    sure of the timing as to whether or not I spoke
24    with him before this.
25 Q. Going to the second page of this report or the

Page 24

1     bottom of paragraph number three, do you see
2     where it says, "The three females were placed in
3     handcuffs for agent and officer safety," bottom
4     third of that paragraph?
5  A. Yes, sir.
6  Q. And then do you see the next notation, which is,
7     "Ramsey Tossa was not handcuffed as he complained
8     of shortness of breath." Do you see that?
9  A. Yes, sir.
10 Q. Is that an inaccurate statement?
11 A. The shortness of breath didn't affect whether or
12    not I handcuffed him.
13 Q. Did you ever tell Agent Tardif or T.F.O. Tardif
14    that the reason Ramsey Tossa was not handcuffed
15    was because he was experiencing shortness of
16    breath?
17 A. I don't recall.
18 Q. You may have said that?
19 A. There's a possibility. I don't recall saying
20    that though.
21 Q. Well, my question is do you deny saying that or
22    are you simply saying you can't recall one way
23    or another whether you said that?
24 A. I can't recall whether or not I said that.
25 Q. So he may have been experiencing shortness of

Page 25

1     breath before you placed him on the ground, is
2     that right?
3  A. Yes, he may have been.
4  Q. Would you have routinely placed somebody --
5     withdraw that question. When you placed him on
6     the ground, you asked him to lie down on the
7     ground, is that right, or you helped him place
8     himself so that he was prone, as you said, on
9     the ground, am I correct?
10 A. I assisted him to a position where he was prone
11    on the ground.
12 Q. Which means his body was stretched out and his
13    face, he was face down on the ground, am I right?
14 A. Yes, sir.
15 Q. And that was I think you indicated for officer
16    safety, is that right, sir?
17 A. It's for everybody's safety.
18 Q. Officer and the subject's safety, is that
19    correct, sir?
20 A. Yes, sir.
21 Q. Could he, for purposes of everyone's safety,
22    would it have been equally as sufficient to have
23    him let's say sitting on the ground?
24 A. In hindsight, I don't know whether or not it
25    would have been, but typically I don't know who

7 (Pages 22 to 25)

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313-567-8100

Jeremy Fitch
6/16/2016

Page 26

1  I'm encountering. We have had older people, you
2  know, that have been just as dangerous as
3  younger people, so I took the necessary
4  precautions I felt best for myself and the team,
5  which was initially proning him out, putting
6  him, assisting him into a prone position.
7  Q. How long was he prone on the ground?
8  A. Just a matter of seconds.
9  Q. Was he searched while he was on the ground?
10 A. I don't recall specifically searching him, but
11    typically I would pat the waistline.
12 Q. Did you start to handcuff him while he was on
13    the ground?
14 A. I don't recall. Typically when they're handed
15    to us, we holster our weapon and then I would
16    routinely reach for my handcuffs, but I don't
17    know whether or not that was what I did in this
18    case.
19 Q. What position were you in as you were doing this?
20 A. I don't recall specifically, but I assisted him
21    to the ground, so I mean he was using his hands
22    to get prone, so I don't know if I was -- I was
23    in a position to assist, so I'm assuming
24    kneeling, but I don't recall for sure what
25    position I was in.

Page 27

1  Q. And when you were kneeling, you mean one of your
2     knees was on the ground, is that right, or both?
3  A. I don't recall.
4  Q. And you say he was only in a prone position for
5     a matter of seconds?
6  A. It wasn't very long. I don't recall exactly how
7     long, but it was briefly long enough for, long
8     enough for me probably just to pat his waist and
9     then bring him up, so it wouldn't have been -- I
10    don't know specifically how long, but it was
11    well less than a minute.
12 Q. When you say bring him up, what do you mean?
13 A. Assist him in -- shortly after I proned him,
14    moments later I assisted him into a kneeling
15    position. I asked him -- he was compliant. He
16    continued rapid breathing, so I asked him to
17    assume a position that was most comfortable and
18    he went into the kneeling position or attempted
19    to push himself up so I assisted him into a
20    kneeling position.
21 Q. At any time while he was prone on the ground did
22    you place your knee on any part of his body?
23 A. Absolutely not.
24 Q. To have done so, would you agree would be
25    unreasonable and excessive use of force?

Page 28

1  A. It would be given his -- he was compliant, so
2     given the way that he was listening, it would
3     have been unreasonable to do so.
4  Q. Clearly unreasonable, right?
5  A. In my opinion, it would be unreasonable to do so.
6  Q. And my question was clearly unreasonable in your
7     opinion, am I right?
8  A. Yes.
9  Q. Was any other officer with you assisting you
10    while you were working with Mr. Tossa?
11 A. I don't recall if anybody else was there. I was
12    focused on Mr. Tossa at the time, so I don't
13    recall.
14 Q. While he was prone on the ground, at any point
15    did you lift either or both of his arms up
16    toward a vertical position for the arms?
17 A. No.
18 Q. Did you lift any part of his body up while he
19    was prone on the ground?
20 A. I assisted him into a kneeling position from --
21    I would have held his arm to assist him.
22 Q. Okay.
23 A. But I wouldn't have, you know, went around and
24    grabbed him. He was moving fine. He was
25    compliant and he was able to do most of it on

Page 29

1  his own, so I was just more assisting and
2  talking to him moreso than anything.
3  Q. When you helped him down onto the ground to be
4     placed in a prone position, describe the
5     physical contact between yourself and Mr. Tossa
6     in doing that.
7  A. As he was going down into the prone position?
8  Q. Yeah.
9  A. I would have maintained a grip on his arm and he
10    used his other arm to lower himself into the
11    prone position, so it was more of a guiding or
12    assisting with his arm.
13 Q. So what you did was to hold his arm. That's
14    your description of the physical contact between
15    the two of you, am I right?
16 A. Right. He didn't need -- he didn't need an
17    abundance of assistance. I mean he was fairly
18    self-sufficient. He was compliant, so he was
19    able to do most of the positioning himself.
20 Q. At any time did you come to the opinion that
21    Mr. Tossa was a frail gentleman?
22 A. No.
23 Q. Did the two of you converse?
24 A. I spoke to him. I don't remember him speaking
25    to me.


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313-567-8100

Jeremy Fitch
6/16/2016

Page 30

1  Q. Was it clear to you that he was conversant or
2     understood English?
3  A. He was compliant, so I was under the impression
4     that he understood enough to do as I asked.
5  Q. At some point did you determine that he was
6     having difficulty breathing or suffering
7     shortness of breath?
8  A. I would describe his breathing as rapid and I
9     don't know if medically there's a difference of
10    shortness of breath versus rapid breathing, but
11    I would describe his breathing as rapid, which
12    again isn't atypical for what we encounter.
13 Q. Yeah, in fact, you describe yourself as
14    sometimes having the same symptomatology, is
15    that right, sir?
16 A. Yes, sir.
17 Q. So his shortness of breath was no different than
18    the shortness of breath that you experience when
19    you undertake one of these operations. Is that
20    a fair statement?
21       MS. URBANIC: Objection as to
22    foundation, but answer if you know.
23 A. All I could hear was just rapid breathing, but I
24    can't say medically whether my rapid breathing
25    is consistent with his rapid breathing.

Page 31

1  Q. (Continuing, by Mr. Goodman) Did you at some
2     point come to the opinion or conclusion that
3     Ramsey Tossa was suffering from shortness of
4     breath?
5  A. Not in the time that I had him or that I was
6     overseeing Mr. Tossa.
7  Q. And how long did you oversee Mr. Tossa?
8  A. Just a matter of a couple of minutes.
9  Q. How did that -- how did you part from Mr. Tossa?
10    Let's put it that way.
11 A. Sure. Agent Holton, as soon as the residence
12    was cleared, Agent Holton came to where we were
13    and he essentially assisted Mr. Tossa in getting
14    back into the house, so he maybe had some
15    conversation. I don't know what happened, but
16    he came out and assisted in getting Mr. Tossa
17    back into the house.
18 Q. Why did he come out to assist Mr. Tossa, if you
19    know?
20 A. I don't know exactly why he did that.
21 Q. Did he indicate, did Holton indicate to you that
22    he had heard or learned that Ramsey Tossa was
23    suffering from difficulty breathing or shortness
24    of breath?
25 A. I don't know what -- I don't know why Agent

Page 32

1     Holton came out.
2  Q. Now, were there any other residents of the
3     household who were placed on the front lawn?
4  A. I don't recall anybody else being on the front
5     lawn.
6  Q. Do you recall the women who had been in the
7     house being brought outside the house?
8  A. I don't know when -- well, I can say that I
9     believe the women came out after Mr. Tossa, but
10    I didn't see the manner in which they were
11    brought out because at that point I was occupied
12    with Mr. Tossa.
13 Q. Occupied doing what?
14 A. My focus was on him, so I don't know when
15    exactly they came out, but I was assisting him
16    to the prone position, assisting him to a
17    kneeling position, talking with him, looking at
18    him, searching, quickly searching.
19 Q. And during that period of time did you hear any
20    of the women that had been brought out of the
21    house saying anything?
22 A. I heard yelling by one or more of the women.
23 Q. What was being yelled, if you can recall?
24 A. I don't specifically remember what was being
25    yelled.

Page 33

1  Q. Was there anything being yelled that had
2     anything to do with Mr. Tossa, if you know?
3  A. I don't recall. I don't recall hearing anything
4     related to Mr. Tossa.
5  Q. Did you say anything to any of the women who
6     were yelling?
7  A. I did not.
8  Q. Could you tell whether they were yelling at you?
9  A. No.
10 Q. Did you hear anybody tell any of the women to,
11    "Shut up"?
12 A. I did not.
13 Q. Did you tell any of the women to shut up?
14 A. I did not.
15 Q. Or did you use the phrase, "Shut the fuck up"?
16 A. I did not.
17 Q. Or hear it used?
18 A. I did not. I did not exchange any conversation
19    with anyone.
20 Q. My question though was whether you heard that
21    phrase used by anyone else?
22 A. No, I did not. I was just answering your
23    previous question. Sorry.
24 Q. Thank you.
25       MR. GOODMAN: One second. I'm just

Page 34

1  going to get some coffee.
2       (Off the record discussion.)
3  Q. (Continuing, by Mr. Goodman) Can you estimate
4     how long -- if I've asked this, I apologize, but
5     I want to ask again. How long it was you had
6     Mr. Tossa under your control and supervision?
7  A. I don't know specifically, but it would have
8     been in the range of, you know, two to three
9     minutes.
10 Q. No more than five?
11 A. No, I wouldn't think more than five, no.
12 Q. Did you ever see any of the women who had been
13    brought out of the house and placed on the front
14    lawn in a prone position?
15 A. No, I did not see anybody prone on the lawn.
16 Q. Other than Mr. Tossa?
17 A. Other than Mr. Tossa.
18 Q. Once Agent Holton took Tossa inside the house,
19    what did you do?
20 A. I don't recall specifically. Typically I would
21    assist with the search of the residence or
22    maintain vision of other occupants of the house
23    such as the women. I don't recall specifically
24    what I did after that.
25 Q. Did you do one or the other; that is, either

Page 35

1  enter the house and search it or keep an eye on
2  the women?
3  A. I don't -- I know I did not search the house.
4     At some point I did go into the house and I
5     don't know if I was -- what I was specifically
6     doing, if it was bringing a camera or bringing
7     an evidence kit or what I did, but I did go into
8     the house at one point.
9  Q. Do you have any recollection one way or another
10    as to whether you supervised any of the women
11    who had been taken out of the residence?
12 A. I wouldn't have been supervising. Whoever had
13    them initially would have stayed with them
14    typically.
15 Q. Do you know who that was?
16 A. I believe Cheryl Benedict was one and I believe
17    Steve West was out there as well, but I know
18    Cheryl was. I'm not sure whether or not Steve was.
19 Q. Do you know whether any of the women were
20    handcuffed?
21 A. Just from reading the report I believe they all
22    were, but I didn't know that at the time.
23 Q. I'm going to hand you what's been marked
24    previously Moore and Fitch Deposition Exhibit 6
25    and ask you if you've seen this document before?

Page 36

1  A. I have.
2  Q. And what is this document?
3  A. It appears to be handwritten notes.
4  Q. And do you know whose handwritten notes they are?
5  A. Kent Kleinschmidt, our group supervisor.
6  Q. And do you know when these notes were taken down?
7  A. After the search warrant, but I'm not sure if it
8     was that night or the next day.
9  Q. You mean after the warrant was executed?
10 A. Yes, sir.
11 Q. Was there a debriefing meeting of any sort, if
12    you can recall?
13 A. I don't specifically -- I don't specifically
14    remember a debriefing, but that's typically what
15    we would do.
16 Q. Do these notes take up the discourse -- withdraw
17    that question. What happens when you do one of
18    these debriefing sessions, Agent Fitch?
19 A. Usually we just discuss more mechanics of the
20    search warrant, if there's things we can improve
21    in doing. Occasionally we'll go over I guess
22    various events that occurred.
23 Q. And when you say the search warrant, you mean
24    the execution of the search warrant, right?
25 A. Yes, the full --

Page 37

1  Q. The operation?
2  A. The full operation, yes.
3  Q. And do these notes reflect the order in which
4     the discussion took place in connection with the
5     debriefing of this particular search warrant
6     execution, if you know?
7  A. Sorry to ask, but can you repeat that question?
8  Q. Yeah, that was hard. You don't have to apologize.
9     I apologize for the question. What I'm asking
10    is the notes start at the top of the page and go
11    down, down the page or two pages, right?
12 A. Yes, sir.
13 Q. And it starts with the discussion of Ramsey
14    Tossa. Do you see that right at the very top of
15    these notes?
16 A. Yes, sir.
17 Q. And my question is given that that's the first
18    thing that's written down, was that the first
19    thing your team discussed when you undertook
20    this debriefing?
21       MS. URBANIC: Objection as to form, but
22    answer as you understood the question.
23 A. I don't remember the context of this discussion,
24    but I would have spoken to Kent at this, so I
25    don't know if there was an overall debriefing

Jeremy Fitch
6/16/2016

Page 38

1  prior to or after -- I don't know the timing of
2  when Kent took these notes is what I should say.
3  Q.  (Continuing, by Mr. Goodman) So my question is
4      was the first thing that was discussed when you
5      had your debriefing session what happened with
6      Mr. Tossa?
7  A.  I don't recall.
8  Q.  And what's noted there is, "Ramsey dad."  Do you
9      see that?
10 A.  Yes, sir.
11 Q.  And that means that he's the father of -- do you
12     know whose father he was?
13 A.  Just from reading, it was I believe he had two
14     daughters and then his wife at the residence.
15 Q.  Two of the women who were in the house, is that
16     right?
17 A.  Yes, sir.
18 Q.  And then it says, "Back door open unlocked.
19     Opened front door."  Do you see that, or back
20     open I guess?
21 A.  I see, "Unforced/opened front door."
22 Q.  Unforced, oh, yeah.  Thank you.
23 A.  Yes.
24 Q.  It says, "Unforced/opened front door," is that
25     right, sir?

Page 39

1  A.  That's the way I read that, yes, sir.
2  Q.  And then it says Jeremy.  That would be you, am
3      I right?
4  A.  Yes, sir.
5  Q.  "On chest, then knees," correct, sir?
6  A.  Yes, sir.
7  Q.  Did you mention that he was only on his chest
8      for a few seconds when you talked to Agent
9      Kleinschmidt about this?
10 A.  I don't remember -- I don't recall if I gave him
11     a duration, but I would have described him as
12     initially placing him on his chest and then at
13     some point bringing him to his knees.
14 Q.  Do you know why that was discussed at all, given
15     the fact that this would have been a routine
16     operation for you to have done?
17 A.  No.  I don't often see Kent's notes.  In this
18     case I mean this is, yeah, in this instance.  I
19     don't know how often he keeps notes for cases.
20 Q.  Okay.  Can we skip down to the part where it
21     says Rhonda there?  Do you see that?
22 A.  Yes, sir.
23 Q.  Can you read that?  You're better at reading his
24     notes than I am I think.
25 A.  Oh, wow.  "Called her out of room.  Justin taken

Page 40

1  out" maybe, but I'm not sure.
2  Q.  Who is Justin?
3  A.  Agent Holton, sir.
4  Q.  Go ahead.
5  A.  "Put cuffs on.  Noticed Ramsey wasn't doing
6      well," and this is -- I don't know if this is
7      exactly what he has written, but this is the way
8      I'm reading it.
9  Q.  Yeah, that's the way I'm reading it, too.
10     "Noticed Ramsey wasn't doing well," right?
11 A.  Yes, sir.
12 Q.  Do you know who that refers to, who noticed that
13     Ramsey wasn't doing well?
14 A.  No, I do not.
15 Q.  Okay.  If that was Holton that noticed it --
16     well, withdraw that question.  At any point
17     before Holton came back to be with Mr. Tossa on
18     the front lawn did you notice that Ramsey wasn't
19     doing well?
20 A.  I noticed continued rapid breathing.  It didn't
21     seem to progress.  It didn't seem to be more
22     rapid or less rapid.  I didn't notice a
23     difference, but I can say it was rapid breathing.
24 Q.  And my question is would you describe that as
25     your noticing that he wasn't doing well?

Page 41

1  A.  I would -- no, no.
2  Q.  Can you read those notes below there?
3  A.  Oh, wow.  Just the third line down is the only
4      one I could venture a guess.
5  Q.  Thank you.
6  A.  "Put on porch with --"  It looks like this is
7      now moved into -- well, actually, I don't know.
8      This may still be Rhonda.  "Put on porch with
9      Rhonda."
10 Q.  Oh, yeah, maybe.  Then at the bottom do you see
11     your name, Jeremy?
12 A.  Yes, sir.
13 Q.  And what's after that?
14 A.  I see Jeremy and above it I see maybe, "Got
15     second set of cuffs," so I don't know if that's
16     referring to me and if that was truly what was
17     indicated, I would interpret that as that I
18     provided someone with a second set of cuffs, if
19     that's referring to me.
20 Q.  And then below that Jeremy and a dash and can
21     you read that word after that?
22 A.  I can't.
23 Q.  Neither can I.  All right.  Okay.  Let's step
24     back for a minute.  When was the first time that
25     you learned that this operation was going to



11 (Pages 38 to 41)

Jeremy Fitch
6/16/2016

Page 46

1   A.  I don't recall knowing that going into this. It
2       may have -- we may have discussed it prior to
3       this, but I recall briefing prior to Marc, but I
4       don't recall if we discussed going to Marc after
5       the Manchester search warrant.
6   Q.  You say you do recall a briefing prior to the
7       Marc Street operation?
8   A.  Absolutely, yes, sir.
9   Q.  Where was that briefing, if you can recall?
10  A.  It was near a, I don't know where exactly, but
11      it was near a park. I mean I remember a decent
12      size parking lot where we fit quite a few cars
13      and I don't remember exactly where, but there
14      was a briefing prior to the Marc Street address.
15  Q.  That would have been a park in Sterling Heights,
16      Michigan?
17  A.  I believe so, yes, sir.
18  Q.  If I were to use the name Nelson Park, would
19      that refresh your recollection on this point?
20  A.  Nelson doesn't ring a bell to me.
21  Q.  Okay. Now, you say you do recall a briefing
22      prior to -- a briefing at some park before this
23      operation. About what time was that briefing?
24  A.  It would have been approximately a couple hours
25      after this, more probably about half an hour

Page 47

1       before we executed the search warrant at Marc.
2   Q.  And what time was the search warrant executed at
3       Marc, if you can recall?
4   A.  It was at two -- may I refer to the exhibits?
5   Q.  Sure, of course.
6       MR. GOODMAN: Let the record show the
7       witness is referring to I believe it's Moore and
8       Fitch Deposition Exhibit 5.
9   A.  So we executed it at 2:20 a.m., so it would have
10      approximately been, I'm guessing, about a half
11      hour prior to that, 1:50 a.m.'ish.
12  Q.  (Continuing, by Mr. Goodman) And while you were
13      being briefed sometime between one and two in
14      the morning there at that park in Sterling
15      Heights, what were you told about the location
16      at Marc Street?
17  A.  I don't recall specifically, but that the
18      residence had an association with the suspect,
19      Jason Yousif.
20  Q.  When you say residence, you mean the house?
21  A.  Yes, sir.
22  Q.  Not residents meaning persons who --
23  A.  C-e.
24  Q.  Yeah, c-e versus e-n-t-s?
25  A.  Yes, sir.

Page 48

1   Q.  Were you told that there were other people who
2       resided in that house as well at that time?
3   A.  I don't recall, but I believe that somebody
4       had -- I believe that somebody that had observed
5       or went by the location said there were multiple
6       vehicles, so I think we suspected that there
7       were more, but I don't recall whether or not
8       that was specifically mentioned. If it was
9       known, it would have typically been mentioned.
10  Q.  And you say you believe that someone had
11      mentioned it. Do you know who that person would
12      have been?
13  A.  It would have -- if the operation was conducted,
14      I suspect it was Adam Tardif. He's the
15      operational lead, if you will, case agent.
16  Q.  Did anyone indicate who the persons were who
17      were residing in the house?
18      MS. URBANIC: Objection, regarding a
19      dismissed claim, but please go ahead and answer.
20  A.  I don't recall, sir. I don't recall
21      specifically if there was mention of other
22      individuals at the residence.
23  Q.  (Continuing, by Mr. Goodman) As someone who was
24      executing this warrant, would it have been
25      helpful for you to know that there was a family,

Page 49

1       a husband, wife and two daughters living in the
2       house before you undertook the search anyway?
3       MS. URBANIC: Objection. I'm just
4       going to renew the objection to this line of
5       questioning because it pertains to a dismissed
6       claim.
7   Q.  (Continuing, by Mr. Goodman) Go ahead.
8   A.  The goal of every operation is to know as much
9       as possible prior to executing the search
10      warrant, so to answer your question, yes, the
11      more information provided related to the
12      residence, the more helpful.
13  Q.  Do you have any -- did you ever ask whether
14      there had been any other surveillance done on
15      the house?
16  A.  I don't recall, sir.
17  Q.  Do you have any information or knowledge as to
18      why there was no other surveillance or
19      information about the residents, the people
20      living in the house?
21      MS. URBANIC: Objection as to form.
22  Q.  (Continuing, by Mr. Goodman) Proceed.
23  A.  Again, I don't recall if that information was
24      disseminated prior to the execution of the warrant.
25  Q.  When Agent Holton brought Mr. Tossa off the

Page 50

1   porch and handed him over to you, could you tell
2   that Mr. Tossa was upset or frightened other
3   than the shortness of -- excuse me, other than
4   the rapid breathing which you described?
5 A. I assumed that the shortness of breath was
6   caused by his surprise, so I guess -- I'm sorry.
7   Could you repeat the question?
8       MR. GOODMAN: Would you read it back
9   please?
10      (Reporter reads back question.)
11 A. No.
12 Q. (Continuing, by Mr. Goodman) So his facial
13   expression did not show any indication of his
14   being upset to you, is that right, sir?
15 A. Maybe I should clarify. As typical with most
16   warrants, he seemed surprised and upset. Was it
17   out of the ordinary? No, but I should clarify
18   that yes, as in most warrants, Mr. Tossa did
19   appear upset, scared, et cetera.
20 Q. Can you describe Mr. Tossa's height?
21 A. I can say he was under six foot.
22 Q. You indicated he was an elderly gentleman. Can
23   you give me an estimate as you recall what his
24   age would have been or range of age or anything
25   like that?

Page 51

1 A. Sorry. Felt like a loaded question.
2       MR. GOODMAN: Off the record.
3       (Off the record discussion.)
4 A. I would say sixties, early sixties.
5 Q. (Continuing, by Mr. Goodman) Okay. Was this a
6   particularly busy period in terms of the work
7   that you and your team were doing, if you can
8   recall?
9 A. We typically have a busy group, so I would, I
10   can't say for sure, but I would suspect so.
11 Q. Do you recall one way or the other whether it was?
12 A. I don't.
13 Q. More busy than usual? Let's put it that way.
14 A. No, I don't.
15 Q. Do you know, you mentioned Jason Yousif before
16   as the suspect. Do you recall that?
17 A. Yes, sir.
18 Q. What did you mean by that?
19 A. He was the individual identified as -- I guess
20   he was the subject matter being investigated in
21   this investigation.
22 Q. Did you know why he was being investigated?
23 A. Just from reading over the reports, that he had
24   ties to marijuana trafficking at the time.
25 Q. Do you know who Dawn Zonca is?

Page 52

1 A. A Michigan State police officer.
2 Q. Right. Was she involved in any way with this
3   operation, if you know?
4 A. Yes, I believe she may have initiated the
5   investigation based on what I've read and then I
6   believe she was also present -- she was present
7   at the search warrant.
8 Q. And when you say initiated the operation, that
9   was as a result of a traffic interaction she had
10   with Mr. Yousif on July 22nd, is that right?
11 A. Yes, sir.
12 Q. And was there, given the fact that her interaction
13   with Mr. Yousif was on July 22nd and your entry
14   into the Manchester location was at around 11:15
15   on July 25th, do you have any knowledge,
16   recollection or explanation at this point as to
17   why that the execution of that warrant was not
18   undertaken at a time earlier either on that day
19   or any other day before then?
20      MS. URBANIC: Objection to the form of
21   the question, also objection because it's a
22   question that pertains to a dismissed claim.
23   Please go ahead and answer.
24 Q. (Continuing, by Mr. Goodman) Please go ahead.
25 A. I can say I don't know exactly the reason for

Page 53

1   this in this particular case, but I can say
2   typically we -- there is some amount of due
3   diligence that needs to be done in terms of
4   obtaining information related to the subject and
5   in this case associated residences, whether that
6   be utility records, surveillance, documentation
7   review. We may issue subpoenas and have a
8   period of time before those requests are filled,
9   so it would be more data collection, and
10   building the case so to speak.
11 Q. Utility records, meaning what?
12 A. It may be often times we request utility DTE
13   bills because targets often or subjects of
14   investigation often utilize their name on
15   utilities and in this case I believe there were
16   DTE records pulled that described electricity
17   usage for certain locations.
18 Q. Which locations?
19 A. In this case it was 134 Manchester.
20 Q. Were there any utility records pulled from Marc
21   Street?
22      MS. URBANIC: I'm just going to renew
23   the objection regarding questions as to a
24   dismissed claim. Go ahead and answer.
25 Q. (Continuing, by Mr. Goodman) Go ahead.

Jeremy Fitch
6/16/2016

Page 54

1   A. I don't recall.
2   Q. Going back to the ops plan, which is Exhibit 3,
3      there is something called a target location in
4      there. Do you see that?
5   A. Yes, sir.
6   Q. What is the target location?
7   A. 134 Manchester.
8   Q. And what makes it the target, if you know?
9   A. It's the location of a search warrant in this
10     case.
11  Q. Well, there was also a search warrant for Marc
12     Street, was there not, if you know?
13  A. Yes, sir. I don't recall -- I don't recall
14     hearing that we were going to execute the Marc
15     search warrant until we were notified after the
16     Manchester. That may have been the case, but I
17     don't recall.
18  Q. The suspect was Mr. Yousif, is that right?
19  A. Yes, sir.
20  Q. Did you know anything about Mr. Yousif, what he
21     looked like, anything like that?
22  A. I believe I didn't see a photo attached in the
23     ops plan, but I mean just from what I read here,
24     and I don't recall seeing it, but it would be
25     very atypical that we didn't have a photo during

Page 55

1      the briefing.
2   Q. Well, it indicates on again the ops plan,
3      Exhibit 3 that there was a photo attached, does
4      it not?
5   A. Oh, okay. Just not to this, but yes, if there
6      was one attached, I would have known.
7   Q. And it indicates an age for him, does it not?
8   A. It does, 26, sir.
9   Q. So that when Mr. Tossa was brought out of the
10     house, it was pretty clear that was not the
11     suspect, Ramsey Yousif, was it not?
12  A. It was clear that that was not Mr. Yousif.
13  Q. While Mr. Tossa was brought out to you by Agent
14     Holton and after he was brought out to you, who
15     was supervising your actions during this operation?
16  A. Our supervisor, Kent Kleinschmidt.
17  Q. Where was he located?
18  A. At which time, sir?
19  Q. During the period that Mr. Tossa was brought out
20     to you?
21  A. I don't recall.
22  Q. Was he outside or inside, do you know?
23  A. I don't recall.
24  Q. Was T.F.O. Tardif in charge in any way or
25     supervising your operations?

Page 56

1        MS. URBANIC: Objection as to form.
2      Please answer if you understand.
3   Q. (Continuing, by Mr. Goodman) Let me rephrase the
4      question. Was T.F.O. Tardif in charge of the
5      operation at Marc Street?
6        MS. URBANIC: Objection as to form, but
7      answer as you understand it.
8   A. Yes, sir. Just to clarify, as you describe,
9      Officer Tardif would have been in charge of the
10     operation and Kleinschmidt would have been the
11     supervisor, ultimately the supervisor over that
12     operation and the functions of the group.
13  Q. (Continuing, by Mr. Goodman) So the person who
14     supervised your actions and activities that day
15     was Kleinschmidt, is that right?
16  A. Yes, sir.
17  Q. Now going back to Tardif, was he present outside
18     the house when Mr. Tossa was brought out to you
19     by Agent Holton?
20  A. I don't recall if there were some members in the
21     house as Mr. Tossa was coming out. I don't
22     recall, sir.
23  Q. When you were part of the entry team at Marc
24     Street, did you have a firearm that was drawn at
25     that time?

Page 57

1   A. Upon approach I would have had my firearm drawn.
2   Q. What was it?
3   A. A Glock. I don't know which gun at the time I
4      had, if it was a 22 or 23, but it most likely
5      would have been one of those.
6   Q. Is that a nine millimeter?
7   A. No, it's 40.
8   Q. And it's a hand gun, right?
9   A. Yes, sir.
10  Q. And you had it drawn -- when Tossa was brought
11     out to you by Agent Holton, was your weapon
12     still drawn?
13       MS. URBANIC: Objection as to form, but
14     answer as best you understand.
15  A. So I would have initially approached the
16     residence with my gun drawn. As Mr. Tossa would
17     have been brought out and I would have been --
18     if I was -- once I was designated as the
19     recipient of Mr. Tossa, the one responsible for
20     Mr. Tossa, I would have holstered my weapon
21     before putting any, before putting or assisting
22     Mr. Tossa.
23  Q. (Continuing, by Mr. Goodman) And is that what
24     you did?
25  A. Yes.

Jeremy Fitch
6/16/2016

Page 62

1   Powell, Agent Moore, myself, Agent Holton, Agent
2   Benedict, Group Supervisor Kleinschmidt. If
3   you're referring to, if you're referring to the
4   Marc address.
5   Q.  Yeah.
6   A.  It would also have been Sterling Heights police
7   officers. I don't recall who they were, but
8   there were two of them. Michigan State police
9   officer, I don't recall who that was. I mean
10  from reading the report I believe it was
11  Officer Zonca. I believe that's it.
12  Q.  How about Hopkins?
13  A.  I saw him on there, but I don't recall seeing
14  him. I saw him listed as an individual, but I
15  don't recall seeing him there.
16  Q.  Did any of the Sterling Heights police officers,
17  what role -- withdraw that question. What role
18  did the Sterling Heights police officers play in
19  this particular operation?
20  A.  They were the uniformed presence that
21  accompanied us, so typically we utilize them and
22  we'll utilize their lights just to show the
23  occupants that it's the police and they're not
24  being robbed, so for everybody's safety, and
25  then generally they're the perimeter. They take

Page 63

1   perimeter or they'll go to the rear of the house
2   or the front of the house and make sure that
3   those areas are safe and secure.
4   Q.  Did you observe any Sterling Heights police
5   officers participate in holding or detaining the
6   residents of the household after they were
7   removed from the household?
8   A.  Once the residence was secure, I remember seeing
9   them near the front of the house and I believe
10  at least one of the females was near the garage
11  of the front of the house after the residence
12  was cleared, safe and secure.
13  Q.  Dealing with the residents in any way, if you
14  can recall?
15  A.  I don't recall them interacting with the residents.
16  Q.  Do you recall any of them inside the house at
17  any time?
18  A.  I don't. I don't recall.
19  Q.  How about the Michigan State trooper?
20  A.  I don't recall.
21  Q.  Do you recall the Michigan State Police canine
22  unit present at the time?
23  A.  Matt Unterbrink, from reading the report, Matt
24  Unterbrink, he's a canine officer, he was there.
25  Q.  Did he interact with any of the residents of the

Page 64

1   household as far as you can recall?
2   A.  I don't recall.
3   Q.  Did he enter the house with the dog, if you know?
4   A.  That would have been his purpose. I don't know
5   if he went in in this instance. I don't know if
6   he conducted a search of this residence in this
7   instance.
8   Q.  Did you ever observe Agent Holton with his
9   firearm drawn, pointed at Mr. Tossa?
10  A.  Agent Holton I believe had approached with the
11  ram and was designated the role, if we needed to
12  breach the door, that was his role, so I don't
13  recall if he would have drawn his weapon.
14  Q.  My question is do you recall one way or another
15  that his weapon was drawn?
16  A.  No.
17      MR. GOODMAN:  Okay. Let me take a break.
18      (Recess 2:35 p.m. to 2:44 p.m.)
19      MR. GOODMAN:  Back on the record.
20  Agent Fitch, thanks a lot. I don't have any
21  other questions.
22      MR. RAITI:  Agent Fitch, I'm Chris
23  Raiti. I represent T.F.O. David Powell. I have
24  no questions for you.
25      MR. KASZUBSKI:  Special Agent, Marc

Page 65

1   Kaszubski on behalf of the Sterling Heights
2   officers. I have no questions for you either.
3              EXAMINATION
4   BY MR. FEDYNSKY:
5   Q.  Good afternoon, sir. My name is John Fedynsky.
6   I represent Trooper Matthew Unterbrink. You
7   were asked a few questions about him. Do you
8   have any particular recollection of what his
9   activities were at the residence other than
10  being present as the canine officer?
11  A.  I don't recall specifically, but typically his
12  role would have been perimeter security
13  initially and then he would typically assist in
14  the search of the residence with his canine.
15  Q.  If requested?
16  A.  If requested, that's correct.
17      MR. FEDYNSKY:  Okay. Thanks for your
18  time, sir.
19      MS. URBANIC:  I have no questions.
20      MR. GOODMAN:  That will do it.
21      (Deposition concluded at 2:45 p.m.)