UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAMSEY TOSSA, RAKIA TOSSA,
SILVIA TOSSA, and RHONDA TOSSA,

        Plaintiffs,

  vs.                 Case No. 14-12319
                      Hon. Gerald R. Rosen
                      Mag. Judge Michael J. Hluchaniuk

Federal Task Force Officer (T.F.O.) ADAM
TARDIF, U.S. Drug Enforcement Agency
(D.E.A.); Group Supervisor KENT KLEINSCHMIDT,
D.E.A.; Federal T.F.O. POWELL, D.E.A.; Special
Agent (S.A.) CHERYL BENEDICT, D.E.A.; S.A.
HOLTEN, D.E.A.; S.A. FITCH, D.E.A.; S.A. MOORE,
D.E.A.; S.A. WEST, D.E.A.; S.A. HOPKINS, D.E.A.;
Officer HELEN TSOUROULLIS, Sterling Heights
Police (S.H.P.D.); Officer KENNETH BRESINSKI,
S.H.P.D.; Officer KRISTIE KAUFMAN, S.H.P.D.;
Officer TOM STECHLY, S.H.P.D.; Officer NANCY
DUPRE, S.H.P.D.; Officer CARLY HALL, S.H.P.D.;
Michigan State Police Trooper M.T. UNTERBRINK;
all in their individual and/or official
capacities; and the CITY OF STERLING
HEIGHTS, a Municipal Corporation.

        Defendants.
_____

    The Deposition of RAMSEY TOSSA

    Taken at 1394 East Jefferson Avenue

    Detroit, Michigan

    Commencing at 9:00 a.m.

    Friday, March 18, 2016

    Before Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR

Ramsey Tossa
3/18/2016

Page 76

1  (Back on the record at 11:30 a.m.)
2  BY MR. TOOMEY:
3  Q. All right. I'm going to move ahead to talk about the
4     morning that you woke up for the DEA search of your
5     home. As I go through this, I'm going to try to --
6  A. Speak louder, please.
7  Q. Yes. I'm going to try to go in as small steps as I
8     can.
9  A. Okay.
10 Q. So we're just going to go little tiny piece by little
11    tiny piece, okay?
12 A. Okay.
13 Q. All right. What is the first thing that you remember
14    when you woke up on the morning when the DEA searched
15    your home?
16 A. Repeat the question, please.
17 Q. What was the first thing that you remember when you
18    woke up on the morning the DEA searched your home?
19 A. I woke up to very loud banging on my door.
20 Q. Did you look to see what time it is? What time it was
21    when you woke up?
22 A. Yes.
23 Q. And what time was it?
24 A. Almost 2 o'clock. I looked at the microwave.
25 Q. Where were you, in what room of the house when you woke

```
 1           up?
 2     A.    I was in the living room.
 3     Q.    Had you been sleeping in the living room?
 4     A.    Yes.
 5     Q.    On the couch?
 6     A.    Yes.
 7     Q.    Were you lying down, or sitting up?
 8     A.    Lying down, laying down.
 9     Q.    How often do you sleep on the living room couch?
10     A.    Since the invasion.
11     Q.    Since 2003?
12                 MS. JAMES:  Object to the form.
13     A.    No.  Since the invasion of the DEA.  I call it
14           invasion.
15     BY MR. TOOMEY:
16     Q.    Okay.  So but before the DEA arrived, you were already
17           on the couch?
18     A.    Yes.
19     Q.    Prior to that, how often would you sleep on the couch?
20     A.    Always.
21     Q.    And the living room, is that the room closest to the
22           front door?
23     A.    No.
24     Q.    Where is the living room in the house?
25     A.    The living room is in the back.  Between the door and
```

Ramsey Tossa
3/18/2016

Page 78

```
 1            the living room, there is a dining room, and there is a
 2            family room.  The living room belongs to me.
 3     Q.     How many bedrooms in the house?
 4     A.     Three.
 5     Q.     And who was in the bedroom closest to the front door?
 6     A.     Silvia.
 7     Q.     How loud was the knocking on the front door?
 8     A.     Repeat the question.
 9     Q.     How loud was the knocking?
10                   MS. JAMES:  Object to the form.
11     A.     It was very loud.
12     BY MR. TOOMEY:
13     Q.     Prior to that night, had you ever heard anyone knock on
14            your door that loudly before?
15     A.     Not this loud.  Sometimes my son.
16     Q.     And he would knock that loudly?
17     A.     What?
18     Q.     He would knock that loudly?
19     A.     No, I said sometimes.  If we can't wake up, he will
20            knock a little bit louder, but not this loud.
21     Q.     Were you startled or scared when you heard the
22            knocking?
23     A.     Of course.
24     Q.     Did that --
25     A.     I was shocked.
```

Luzod Reporting Service, Inc.
313-962-1176

Ramsey Tossa
3/18/2016

Page 132

| | | |
|---|---|---|
| 1 | A. | I couldn't talk any more. |
| 2 | Q. | Was there any period after they lifted you up off the |
| 3 | | ground, was there a period where they were just holding |
| 4 | | you up, but you were still on the lawn, or did they |
| 5 | | pick you up, and immediately take you into the house? |
| 6 | | MS. JAMES:  Object to the form. |
| 7 | A. | I remember they were trying to help me, because they |
| 8 | | were kind to me, different than the beginning. They |
| 9 | | lifted me, and they took me all the way inside.  But |
| 10 | | the only thing I remember is they were very kind to me. |
| 11 | | Silvia put this in my mouth, and I remember that when |
| 12 | | Silvia put this in my mouth, I know the show is gone. |
| 13 | BY MR. TOOMEY: | |
| 14 | Q. | The show is gone? |
| 15 | A. | The show that they did, the raid, you know, it's out. |
| 16 | | I can't remember, you know, yeah. |
| 17 | Q. | So after they picked you up, they were kind to you? |
| 18 | A. | Yes.  They didn't push me, or grab me, and hold my |
| 19 | | neck.  They freed my hands.  Complete position was |
| 20 | | changed 180 degrees. |
| 21 | Q. | All right.  Back when you were on the lawn, and when |
| 22 | | you could see Silvia, was Silvia ever crying tears? |
| 23 | A. | Yes. |
| 24 | Q. | When did she start crying? |
| 25 | A. | I don't remember.  She was crying and yelling all the |

Page 135

1 point in the evening, did anyone else push you or, you
2 know, move you around in an aggressive way, or choke
3 you, or anything like that?
4 A. No.
5 Q. After you were allowed up off of the lawn, did any
6 officer continue to point a gun at you?
7 A. No.
8 Q. All right. Other than the things that we've already
9 talked about, the officer who grabbed you when he
10 pulled you out of the house taking you to the lawn,
11 putting you down on the lawn, pinning you, and another
12 officer grabbing your legs, do you have any complaints
13 about any other officer touching you?
14 A. No.
15 Q. And the two officers who did touch you, did they do
16 anything else that we haven't already discussed that
17 you object to?
18 MS. JAMES: Object to the form.
19 A. That's the only thing they did to me.
20 MR. TOOMEY: Could we take a break?
21 MS. JAMES: Yes.
22 (Break at 12:51 p.m.)
23 (redacted)
24
25

Ramsey Tossa
3/18/2016

Page 159

1  Q.  Did he ever say anything to somebody else while you
2      were standing there?
3              MS. JAMES:  Object to the form and
4      foundation.
5  A.  No.
6  BY MR. MORRIS:
7  Q.  After you were grabbed by the officer, you said that he
8      left the area, left the porch, and went inside; is that
9      true?
10 A.  He was in my back.  I don't know where did he go.
11 Q.  He went behind you?
12 A.  He was behind me.
13 Q.  You don't know if he went in the house or not?
14 A.  No, I don't know.
15 Q.  Do you know if you ever saw him again after that first
16     encounter?
17 A.  I don't remember his face.
18 Q.  So you don't know if you ever saw him again?
19 A.  No.
20 Q.  You have no knowledge of what it is that he might have
21     done after you left the porch, do you?
22 A.  No.
23 Q.  Okay.  How long would you estimate he was on the porch
24     from the time you saw him until the time you were
25     grabbed?

Ramsey Tossa
3/18/2016

Page 160

| | | |
|---|---|---|
| 1 | A. | A few seconds, not even a minute. |
| 2 | Q. | A few seconds? |
| 3 | A. | Yeah. It was not enough time to look at his face. |
| 4 | Q. | It happened very quickly on the porch? |
| 5 | A. | Yes. |
| 6 | Q. | Have you ever seen him since that night any other time? |
| 7 | | Have you ever seen him again? |
| 8 | A. | Even if I see him, I won't recognize him. |
| 9 | Q. | Anything about his physical description that you do |
| 10 | | remember other than he was about the same size as the |
| 11 | | other guy, and was Caucasian? Anything else you recall |
| 12 | | about him? |
| 13 | A. | That's it. |
| 14 | | MR. MORRIS: Okay. That's all I have. |
| 15 | | Thank you. |
| 16 | A. | I know he didn't have long hair. |
| 17 | | MR. MORRIS: All right. |
| 18 | A. | With a pony. |
| 19 | | MR. MORRIS: Some of these other gentlemen |
| 20 | | may have questions. I'm all set. Thank you. |
| 21 | | EXAMINATION |
| 22 | BY MR. FEDYNSKY: | |
| 23 | Q. | I'll move closer so you can hear me. |
| 24 | A. | He has a pony hair. I won't forget his face, because |
| 25 | | lots of minutes I'm looking at him. |

Luzod Reporting Service, Inc.
313-962-1176

Page 179

STATE OF MICHIGAN   )
                    ) SS
COUNTY OF WAYNE     )

I, Joanne Marie Bugg, Notary Public within and for the County of Wayne (acting in Wayne), State of Michigan, do hereby certify that the witness whose attached deposition was taken before me in the above-entitled matter was by me duly sworn at the aforementioned time and place; that the testimony given by said witness was stenographically recorded in the presence of said witness and afterwards transcribed by computer under my personal supervision, and that the said deposition is a full, true and correct transcript of the testimony given by the witness.

I further certify that I am not connected by blood or marriage with any of the parties or their attorneys, and that I am not an employee of either of them, nor financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at the City of Detroit, County of Wayne, State of Michigan, this 25th day of March, 2016.

*Joanne Marie Bugg*
Joanne Marie Bugg, CSR-2592
Wayne County, Michigan
My Commission expires: 2-26-19